Filed December 17, 1895.

---

No. 17,095.

THE COLUMBIAN ATHLETIC CLUB *v.* STATE, EX REL. MCMAHAN.

INJUNCTION.—*Criminal Law.—Prize Fights.—Abuse of Corporate Privileges.*—An injunction against the abuse of corporate privileges by conducting prize fights will not be denied because the wrongful acts constitute crimes.

RECEIVER.—*To Hold Property of Corporation Which Has Forfeited Its Franchise.—Prize Fights.—Injunction.—Criminal Law.*—A receiver of the property of a corporation which has forfeited its franchise by unlawfully conducting prize fights, may be appointed to hold the property subject to the order of the court, when necessary to aid an injunction against the further unlawful use of the property.

From the Lake Circuit Court.

*J. B. Peterson* and *E. D. Crumpacker*, for appellant.

*B. K. Elliott, W. F. Elliott, J. E. McCullough, J. Kopelke, H. N. Spaan* and *W. C. McMahan*, for appellee.

HOWARD, C. J.—On the 2nd lay of September, 1893, the appellee, by her relator, who is the prosecuting attorney, filed in the clerk's office of the court below, her verified complaint or information, alleging, amongst other things, that the appellant was a corporation, duly organized and then existing under the laws of the State of Indiana; that the said appellant, assuming to act as such corporation, was engaged in violating the laws of the State, and had misused its corporate powers and franchises; that under the claim of corporate right, and in its character as a corporation, the appellant had willfully violated the statute of the State, prohibiting prize fighting, giving the details of such violation; that the appellant claimed the right, as a corporate franchise, to conduct prize fights, insisting that the statute, under which it was organized, gave to it such right; that, by reason of such wrongful claim, it had induced persons to believe that it had a franchise under the laws of the State to engage in such business of prize fighting, and so had greatly abused its corporate privileges and usurped authority which it did not possess; that it had fitted up and maintained its premises in the county of Lake for the sole purpose of engaging in prize fighting; that it advertised such business in the most public manner, and thus induced thousands of persons to come upon its said premises, in order to witness men engaged in fighting one another for prizes to be awarded to the victors; that the appellant, as such corporation, had further abused and misused its corporate franchises and violated the statutes, by bringing into the State certain persons to perform the duties of sheriffs and other peace officers,

and by causing such imported persons, so feloniously
assuming to act as peace officers, to beat, bruise and
wound persons assembled on appellant's said premises;
that many persons were, in consequence, grievously
wounded, and that even death had been thereby caused;
that appellant, in violation of another statute, had con-
spired with divers persons, to appellee unknown, to com-
mit and procure the commission of an offense in the
night time, to-wit: prize fighting, upon said premises;
that appellant, in its said corporate capacity, had caused,
created, and was then maintaining a public nuisance on
its said premises, in that it had thereon prepared and
constructed buildings and other structures, for the sole
purpose of procuring men to fight therein for prizes,
giving details of fights that had already taken place,
stating also the riotous proceedings that followed, and
that appellant avows its purpose to continue such prize
fighting; that appellant fortified and strengthened its
buildings, so as the better to enable it to carry on its
said illegal business, as well as to render it the more dif-
ficult for sheriffs and other peace officers to enter and
arrest those engaged in the violation of the laws, pur-
suant, also, to the purpose and design of the appellant
to permanently use and maintain its premises for the
sole purpose of conducting prize fights on its said prem-
ises; that, under claim of corporate right and privilege,
appellant would, if not enjoined, continue its usurpation
of corporate functions, and its abuse of its corporate
franchises, thereby causing tumults and riots, so that
human life would be endangered, and the local officers
of the county be unable to suppress the consequent vio-
lence; that the incorporators, as well as all those thus
engaged in violation of the laws, were non-residents of
the State of Indiana; that appellant had conspired with
certain persons named, and with others whose names

were unknown, with the purpose, in the event that the court should issue such restraining order, to render the same nugatory, by having the prize fights conducted by such other persons; that unless a receiver should also be appointed, the appellant would falsely and fraudulently assign its rights and property to said co-conspirators, or other third parties, so that prize fighting and other unlawful acts might still be conducted, notwithstanding such order of the court.

The prayer was for a dissolution of the incorporation as having forfeited its franchises, and that it be ousted therefrom; that an injunction be issued, and that a receiver be appointed to take charge of the property, until the further order of the court. The restraining order was issued by the judge in vacation, and was directed especially against a fight advertised for the 4th day of September, being two days after the issue of the order; and the receiver was appointed for the property of appellant in Lake county, being the premises in question.

The appointment of the receiver is assigned as error; and it is contended by counsel for appellant that the court erred both in the issuing of its restraining order, and also in the appointment of the receiver, for the reason that equity will not aid in the punishment, or in the prevention of crime.

"One sufficient reason, among the many," say counsel, "for denying the jurisdiction of equity in this class of cases, is that the law regards the crimes charged as those of the individual perpetrators, and not of the corporation, and the penal laws are adequate to redress wrongs against society by punishing the offenders. Corporations, as such, have no capacity to commit the kind of crimes charged in the information."

In answer to this may be given what a great English

judge, Vice-Chancellor Shadwell, said, when appealed to for a receiver in a case where a corporation had violated an injunction: "The directors of the company, their agents and servants cannot, on this motion, be committed to prison; but what can be done, shall by me be done to repress this daring invasion of public and private rights—an invasion maintained, moreover, in open defiance of all law, authority, and order. Let a sequestration issue." *Att'y-Gen.* v. *Great Northern R. W. Co.*, 4 De Gex & S. 75, as cited in 2 Redf. Rys. (6th ed.) 419.

In Judge Redfield's work, cited above, Vol. 2, p. 364, the author says: "Injunctions in courts of equity, to restrain railways from exceeding the powers of their charters, or committing irreparable injury to other persons, natural or artificial, have been common for a long time in England and in this country."

Extraordinary emergencies in many cases call for extraordinary remedies. In chapter 29 of the work from which we have quoted, Judge Redfield, both in the text and in the notes, gives numerous instances of the interposition of equity to prevent threatened wrongs on the part of corporations.

The rule to be observed in such cases is quoted at p. 366 from Lord Chancellor Cottenham, "That it is the duty of the courts of equity (and the same is true of all courts and of all institutions) to 'adapt its practice and course of proceeding, as far as possible, to the existing state of society, and to apply its jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continually arise, and not from too strict an adherence to forms and rules established under very different circumstances, decline to administer justice, and to enforce rights for which there is no other remedy.'" This rule, the author concludes, is certainly

worthy of one of the ablest, wisest and best judges that ever administered the chancery law of England or America.

In the well considered case of *Att'y-Gen.* v. *Chicago, etc., R. W. Company*, 35 Wis. 425, by Chief Justice Ryan, that eminent jurist quotes with approval from Brice's Ultra Vires, on p. 526, as follows:

"Under many circumstances, the court of chancery has, on public grounds, jurisdiction to prevent corporations acting in various ways, or contrary to the intent for which they have been created. The public, however, must be represented in all applications relating to such matters, and this is done by the intervention of the attorney-general. No single person, whether a member of the corporation * or not, is able on his own account, and of his own motion, to call upon the court to interfere for his special protection. The wrong he complains of is not confined to himself; no right or privilege peculiar to himself is violated; the wrongs inflicted and the rights invaded affect the public, and the public, consequently, must be a party to the proceedings. The occasions upon which the court will exercise jurisdiction to restrain the doing of acts of this kind, seem to fall into the three following heads:' * * '(1). When a corporation is abusing powers given for public purposes; (2), or is committing a breach of trust; (3), or is acting adversely to public policy.'"

Under the third head, "When any corporation is doing acts detrimental to the public welfare, or hostile to public policy," the author quotes from *Attorney-General* v. *Great Northern R. W. Co.*, where Kindersley, V. C., said: "Whenever the interests of the public are damnified by a company established for any particular purpose by an act of parliament, acting illegally and in contravention of the powers conferred upon it, I con-

ceive it is the function of the attorney-general to protect the interests of the public by an information; and that, when in the case of an injury to private interests, it would be competent for an individual to apply for an injunction to restrain a company from using its powers for purposes not warranted by the act creating it, it is competent for the attorney-general, in cases of injury to public interests from such a cause, to file an information for an injunction."

In the same case, the learned chief justice, in criticising *Bigelow* v. *Hartford Bridge Co.*, 14 Conn. 565, says: "The court holds the jurisdiction in cases of private nuisance and of public nuisance inflicting particular injury, at the suit of an individual, and questions it at the suit of the State. It is not easy to comprehend why the remedy should avail against the less evil, and not against the greater; why equity should interpose to restrain what affects one person only, and refuse its protection against what affects all persons; in the case of a public nuisance, restrain it at the suit of one whom it especially aggrieves, and refuse to do so for the public whom it equally aggrieves."

Counsel for appellant say that "An act is frequently of such a character as to involve not only a breach of criminal law, but also a transgression of civil duty, and in such cases redress may be had not only by the State in the form of a criminal prosecution, but the one who suffers a civil injury may have his action for damages. For instance, if one steal a horse, he is subject to prosecution under the criminal laws of the State, and at the same time, notwithstanding that liability, the individual who suffers the loss has a right to prosecute an action against the offender for damages; and in connection with such action conditions may be such that the court would enjoin the defendant from disposing of his prop-

erty until judgment could be obtained, and even go further and appoint a receiver for the purpose of preserving the property in order that the judgment might be satisfied.    But no one will contend that the State could enjoin the offender from stealing other horses."

Counsel admit very much here.    It is not, however, the stealing of other horses that is in question.    It is quite enough to attend to the horse and to the crime under consideration.    The court might certainly enjoin the using of the horse for such purpose as might affect the rights of the complaining party; as for instance, might enjoin the sale or transfer of the property to others.    So here, while it is perhaps true that the commission of crime, strictly speaking, cannot be enjoined, yet the transfer of property for fraudulent purposes, or to evade the processes of the court, or to prevent the execution of its decrees, may be enjoined. If this corporation might transfer its rights, franchises and property to another company or to individuals during the pendency of this action, and so continue the perpetration of the acts complained of in the very face of the court, it would be but a mockery of justice to have instituted the action in the first place.    This is a proceeding against property as well as against the corporation.    The property itself is criminal and can be used only for criminal purposes.    If there be any virtue in the *quo warranto* proceeding, it must result not only in the dissolution of the corporation but also in the discontinuance of the use of its property for the evil purposes to which it had been prostituted.

In case the offender were an individual and the property were personal, there could be no question that it could not be lawfully held by the criminal.    Shall it be said that what the State may do in the case of one of its

citizens it is powerless to do in the case of a corporate creature, the product of its own statutes?

In *State* v. *Lewis*, 134 Ind. 250 (20 L. R. A. 52), this court upheld a statute making it a misdemeanor for any one to have in his possession any gill net or seine, except as permitted by the statute; and numerous decisions sustaining like statutes were cited.

In those cases, the mere possession of articles otherwise harmless was rendered unlawful for the reason that they might be used in the commission of acts made criminal by the statute. But where the articles found in possession of one arrested for crime are themselves the instruments of such crime, and made only to be used in violation of the law, it has always been held that the criminal could not lawfully own or possess them. The right to seize and hold such instruments of crime is no more doubtful than the right to arrest the criminal himself. Accordingly the gambler's outfit, the burglar's tools, the counterfeiter's dies, are seized wherever and whenever found. There can be no lawful possession or use of such things by any one save the officers of the law.

Shall the courts be helpless in like cases where the criminal is a corporation and where the property used as the instrument of crime is real and not personal?

In *Smith* v. *McDowell, State's Attorney*, 148 Ill. 51 (22 L. R. A. 393), which was a case where it was sought to vacate a part of a public street for the benefit of a private person, the court held that such attempted vacation and use of the street would constitute a public nuisance, and that the public was entitled to the speediest and most effective remedy to prevent the threatened invasion of its rights, and therefore that such nuisance might be forbidden by injunction at the suit of the proper officer; citing Wood

Nuisances, sections 777, 786; Dill. Munic. Corp. 520; 3 Pom. Eq. Juris. 1359, and other authorities.

Even where a private citizen brings an action to prevent a public wrong, from which he would suffer an injury peculiar to himself, and not sustained by the public in general, an injunction may be awarded to prevent the commission of the threatened crime; and the objection will not be heard that the equity powers of the court cannot be employed to aid in enforcing the criminal laws of the State by thus preventing crime about to be committed. *People's Gas Co.* v. *Tyner*, 131 Ind. 277 (16 L. R. A. 443). "No authority," said the court in that case, "has been cited, and we know of none, supporting the position of appellants that the appellee is not entitled to an injunction because the accumulation of nitro-glycerine within the corporate limits of a town or city is a crime."

But counsel say that in these cases equity was interposed for the protection of property rights and not for the prevention of crime. It may be remarked that property rights are in question in the case before us also. Notwithstanding the criminal use to which the property of appellant has heretofore been put, it should nevertheless be preserved for such final and just disposition as may be decreed by the court. Moreover, since the incorporators are all non-residents, and since they own no property but this in the State, the State is interested in its preservation at least to the extent of the expenses of this suit.

Besides, though generally true, it is not absolutely so, that an injunction can only issue to preserve mere property rights. "There are many adjudged cases," as said in *Littleton* v. *Fritz*, 65 Iowa, 488, 54 Am. Rep. 19, "which expressly hold that the fact that a nuisance is a crime, and punishable as such, does not deprive equity of its jurisdiction to restrain and abate it by injunction."

See also Tiedeman Eq., sections 483; 484, 581, and 3 N. W. Law Rev. 219.

In *State, ex rel.*, v. *Saunders*, 18 L. R. A. 646, the supreme court of New Hampshire, in a very elaborate and well considered case, decided that "An injunction against the unlawful use of buildings as a nuisance is not beyond the jurisdiction of equity on the ground that it is in the nature of a punishment of a criminal offense." It will be observed that this decision is exactly in point; the court below having issued its injunction against the unlawful use of appellant's buildings. In both cases the State sued by its proper officer, and property rights are no more in question in one case than in the other.

In *State, ex rel.*, v. *Crawford*, 28 Kan. 726, 42 Am. Rep. 182, the court said : "While it is unquestionably true that the keeping of the saloon in question is a criminal offense, and its operation involves the commission of many criminal offenses, yet we cannot think that these facts can possibly take away any of the jurisdiction which courts of equity might otherwise exercise."

In *Littleton* v. *Fritz, supra*, it was said : "One maintaining a nuisance may not only be punished in a criminal proceeding, but a civil action at law * and an action in equity to restrain the nuisance may be prosecuted against him. * * * The defendant, in order to succeed in the defense that the proceeding by injunction is an attempt to enforce a criminal law by civil process, demands, in effect, that the courts must establish the principle that, because the nuisance complained of is a crime, it is entitled to favor and protection in a court of equity."

The main contention of appellant is thus well answered by the supreme court of Iowa. There could be no doubt that under section 1145, R. S. 1894 (section 1131, R. S. 1881), an information might be filed against corporations

such as this, where they "do or omit acts which amount
to a surrender or a forfeiture of their rights and privi-
leges as a corporation, or where they exercise powers
not conferred by law." Nor could there be any doubt
that under section 1236, R. S. 1894 (section 1222, R. S.
1881), a receiver might be appointed when the corpor-
ation "has forfeited its corporate rights;" or when,
"in the discretion of the court, or the judge thereof, in
vacation, it may be necessary to secure ample justice to
the parties."

As soon, however, as it appears that the acts shown
in the information are criminal, the conclusion is at
once reached that the criminality of the transactions
throws a shield over the culprit, so that equity may not
reach it. As in the case of other criminals, justice and
equity are the very last things it seeks for.

Counsel for appellee well observe in this connection
that : "It would be monstrous to adjudge that because
acts constituting the abuse of corporate privileges, are
crimes, therefore the corporation may persist in doing
them. This would be to encourage corporations to per-
petrate the gravest abuses, since, under such a rule, the
graver the abuse, the less the power of the civil branch
of our law. It comes with an ill grace from a corpora-
tion to aver that because the abuse of its corporate privi-
leges consists in committing crime, civil remedies are
unavailing. It would outrage common sense unspeak-
ably to give ear to a corporation defending itself against
a civil proceeding, by asserting its own infamy, and
insisting that redress can only be had under the laws
punishing crimes."

A like conclusion was reached in Massachusetts, in the
case of *Carleton* v. *Rugg*, 149 Mass. 550 (5 L. R. A. 193);
the language of the court being : "The fact that keep-
ing a nuisance is a crime, does not deprive a court of

equity of the power to abate the nuisance." See also Morawetz Priv. Corp., section 1043.

As to whether the premises of appellant constitute a public nuisance, we may very fittingly borrow the following definition from *State, ex rel.*, v. *Crawford, supra*, that: "Every place where a public statute is openly, publicly, repeatedly, continuously, persistently, and intentionally violated, is a public nuisance." The definition fits this prize fighting establishment most perfectly; and, under the foregoing authorities, we have no doubt that equity may interpose to restrain its further operation, even though the acts charged in the information are criminal.

And if equity may so interpose, certainly it may make its interposition effective. As shown by the information, the injunction, if issued, would not of itself have been sufficient to restrain the nuisance without the aid of the receivership. But equitable remedies must be complete. The arm of equity is not shortened, but will reach out to secure full right in the premises. The receivership being, therefore, necessary, in order to secure the full effect of the injunction, equity will not refrain from the appointment of a receiver for such purpose. The receivership in this case is not necessarily for the sequestration and sale of the property, but only to take charge of the same, until the further order of the court in aid of the injunction.

The circumstance set forth in the information, that appellant pretends to have conducted its nefarious business under provisions of the voluntary association statutes of the State, scarcely merits consideration. The constitution puts its special bans on lotteries, duels, and all infamous crimes; while, at the same time, it provides for the moral and intellectual improvement of the people. A statute which should attempt to authorize prize fighting, would, most certainly, be opposed to the

spirit of the constitution; and, indeed, to that of the law itself, long since defined to be "A rule of civil conduct, prescribed by the supreme power of a State, commanding what is right, and prohibiting what is wrong." The Legislature had no intention to enact any such statute.

For the reason, therefore, that the information shows the premises of appellant to be a public nuisance, and also for the reason that it is likewise shown that appellant has misused and abused its corporate franchises and privileges, the court did not err in issuing the restraining order, and in appointing a receiver, the appointment of a receiver being necessary to render the restraining order effective.

The judgment is affirmed.

Filed June 4, 1895; petition for rehearing overruled December 13, 1895.

### DISSENTING OPINION.

HACKNEY, J.—While it would be a pleasure to me to concur in any opinion that had for its purpose to stay the commission of the numerous offenses against the criminal and civil laws of the State charged in the complaint against the appellant, I regret that I cannot concur in the conclusion that the equitable remedy of a receivership can be invoked for that purpose. I do not question the conclusion that the writ of injunction was properly issued; that question, however, is not before us, but if a proper remedy it was certainly effectual to stay the employment of the State's corporate franchises in the commission of crime. If the scope of the writ were too narrow to reach those who might operate in spite of its terms, a wider scope could be given it, if power existed at all to issue the writ. It is certainly enough to say that equity will go so far as to hold the criminal while the

The Columbian Athletic Club *v.* State. *ex rel.* McMahan.

law punishes him. My doubts have arisen as to the proposition that a receiver may be appointed, a remedy only granted by equity in clear cases where the rights and interests of the parties must suffer by its denial. The office of a receiver, so far as my knowledge and observation have gone, has always been to preserve the property to be received, held or disposed of, for the benefit of an owner, creditor, lienor, lessee or other person interested, and not simply to restrain the owner from transferring it or using it; such holding of the property is but another method of enjoining. The theory of the appellee is, when reduced to its logical results, that equity, by its remedy of receivership, will confiscate property used for criminal purposes. Indeed, many of the citations of counsel and of the majority opinion are to the effect that such taking is as in cases of confiscation of the implements of crime. I think it may be safely said that no case can be found where confiscation was under equitable authority but in every instance it has been authorized by statute.

Nor do I believe that R. S. 1894, section 1236, enlarges the powers of equity in this respect. The implication must accompany this statutory provision that the receiver is necessary to preserve the property for some person having an interest in it. I cannot resist the conclusion that the true office of a receiver does not include the mere holding of property to stay the commission of crime.

Filed June 4, 1895.